**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KEVIN ORGILL,

Plaintiff,

v. No. CIV 01-1249 BB/DJS

NORSTAN COMMUNICATIONS, INC., a foreign corporation,

Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court for consideration of Defendant's motion for summary judgment (Doc. 39). The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that the motion will be granted in part and denied in part.

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*,, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.*_ On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to

create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider the motion for summary judgment in light of this standards.

**Summary of Facts**

Plaintiff was employed by Defendant as a sales representative. He earned a base salary of $45,000 per year, and a substantial amount above that in the form of commissions he earned from making sales to customers. While Plaintiff worked for Defendant, his primary focus was on what was called the "e-rate" business. This involved a process in which Plaintiff worked with local schools in New Mexico, informing them that federal funding might be available for technology upgrades. Plaintiff helped the interested schools fill out and submit an application to the federal government, requesting funding for specific projects. After a delay of as long as six months, the applications were granted in full, granted in part, or denied. At that point, unless the school decided not to pursue the project, a contract would be finalized between each school and Defendant.

In early 2001, Defendant was experiencing heavy financial losses. On March 13, 2001, Plaintiff was informed that he was being laid off from his position. At that time a number of e-rate applications on which Plaintiff had worked, worth around $11,000,000 in potential contracts with Defendant, were pending before the federal government. After Plaintiff was discharged, several of these applications, around $2,900,000 worth, were approved for funding. It is not clear to the Court how many of these funded applications actually resulted in contracts with Defendant. Plaintiff was not paid a commission for any of the funded projects, because no payments had been made on any of the projects prior to March 13, 2001. Defendant's position was that a Sales Operations Manual ("SOM"), promulgated by Defendant and signed by Plaintiff, governed Plaintiff's right to commissions on pending e-rate funding requests. According to the SOM, unless payments had been received from the customer before the date of termination, a sales professional such as Plaintiff would

not be entitled to any commission on that contract, even though the contract was "in the pipeline" for possible funding.

Plaintiff was not happy that he received no compensation (other than his base salary) for the work he had done in making the potential sales to various schools, and in facilitating the schools' applications for funding. He has filed this lawsuit raising several claims. First, he claims that Defendant has been unjustly enriched by getting the benefit of his work, in the form of the contracts that were eventually finalized, without having to pay him a commission. Second, in a claim not raised in his complaint but suggested in his response, Plaintiff argues that even under the terms of the SOM he was entitled to commissions on sales that were finalized prior to the end of April 2001.[1] Third, Plaintiff maintains that Defendant violated New Mexico public policy by choosing to lay him off instead of the other sales representative in the Albuquerque office, in a deliberate effort to avoid paying him the commissions that were in the pipeline. Finally, Plaintiff maintains that Defendant violated a New Mexico statute, NMSA § 50-4-4, which requires an employer to pay a discharged employee all compensation due that employee within a certain number of days.

---

[1]This issue was actually not briefed by Plaintiff. It arises because of an affidavit submitted by Plaintiff in support of his response to the summary-judgment motion. In that affidavit Plaintiff claimed he was not paid the commissions he was owed even under the SOM. The issue is considered as a motion to amend the complaint to add such a claim, because the Tenth Circuit has held that "[i]ssues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed.R.Civ.P. 15." *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790, n.9 (10th Cir. 1998) (citing *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir.1991) (a plaintiff should not be prevented from pursuing a valid claim just because he did not include it in his complaint, provided that a late shift in the case will not prejudice the other party in maintaining his defense), and *United States ex rel. Schumer v. Hughes Aircraft Company*, 63 F.3d 1512, 1524 (9th Cir.1995) ("when a party raises a claim in materials filed in opposition to a motion for summary judgment, the district court should treat the filing as a request to amend the pleadings and should consider whether the evidence presented creates a triable issue of material fact.")). Considering this claim will not prejudice Defendant since it has always maintained it is the SOM which controls the proper calculation of Plaintiff's commission.

**Discussion**

**Unjust Enrichment Claim:** Defendant maintains that the unjust enrichment claim fails as a matter of law, because the unjust enrichment doctrine is a non-contractual remedy that applies only where no contractual relationship governs the dispute between the parties. According to Defendant, the terms of the SOM governing payment of commissions are a contract as to that topic, and those terms override any possible off-contract remedy. Plaintiff takes strong exception to this argument, pointing out that the SOM contains an explicit disclaimer stating that no provision of the SOM is intended to create a contract between Defendant and its employees, or to alter the at-will relationship between those parties. (Exh. 5 attached to Exh. A, Pltf. Resp.) In addition, the written offer of employment tendered to Plaintiff also contains a disclaimer indicating that nothing in any policies, procedures, or handbooks Plaintiff might receive is intended to create an employment contract. (Exh. 2 to Exh. A, *id.*) Plaintiff contends the presence of these disclaimers means the SOM provision governing payment of commissions upon discharge cannot be considered a contractual provision.

Applying New Mexico law concerning disclaimers in employment handbooks, the Court disagrees with Plaintiff's position. New Mexico courts have been vigilant in not allowing employers to make specific promises in an employee manual, on the one hand, and then attempt to avoid those promises by inserting a disclaimer into the manual. *See, e.g., Mealand v. Eastern New Mexico Medical Center*, 33 P.3d 285, 291-92 (N.M. App. 2001) (holding that employee manual may supplement or modify an employer-employee relationship, despite the presence of a disclaimer similar to the one at issue in this case). Where a handbook or manual contains detailed statements that impose specific requirements on an employer, those statements or promises will be enforceable even when the manual contains a disclaimer purporting to negate the possibility that the manual might be construed as a contract. *Id.* In this case, the SOM contains specific language setting out the

commissions an employee will be entitled to upon termination of the employment relationship. (Exh. 4, Def. MSJ) That specific language applies to, and controls, that particular aspect of the parties' employer-employee relationship, despite the disclaimers disavowing any intent by Defendant to create a contract. *Cf. Padilla v. RRA Inc.*, 946 P.2d 1122, 1126 (N.M.App. 1997) (agreement to pay commissions could be enforced even if it was oral and not definite). It is clear that the disclaimers are aimed at ensuring that the relationship between Defendant and its employees remained an at-will employment relationship; both disclaimers specifically mention the at-will nature of the employment agreement. The fact that Plaintiff was an at-will employee, however, does not mean that his right to receive commissions was not a contractual right governed by the terms of a contract. *See, e.g., McGough v. Broadwing Communications, Inc.*, 177 F.Supp.2d 289, 295-96 (D.N.J. 2001) (fact that plaintiffs were at-will employees did not excuse employer from complying with agreement to pay commissions to plaintiffs); *see also Mytych v. May Dep't Stores Co.*, 2001 WL 290485 (Conn.Super. 2001, unpublished) (issue of whether employee manual may be read as a promise of continued employment is entirely distinct from employee's right to compensation; as to latter, there is a binding contract to pay as agreed even where the writing specifically claims the benefits are not contractual).

In sum, where there is a disclaimer in an employee handbook but the handbook also contains specific, enforceable provisions governing certain aspects of the employment relationship, those provisions will be enforced against both the employer and the employee, since they constitute a contract. In this case Plaintiff had a contractual right to be paid commissions despite Defendant's disclaimers of any contractual relationship. However, that right was subject to the terms of the agreement between the parties concerning commissions. This agreement was set out in a one-page Incentive Plan establishing the commission percentages to which he was entitled (Exh. 3, MSJ), as

well as in the SOM provision concerning commissions payable on termination of employment.[2] The Court finds, therefore, that there was a contract governing the payment of commissions to Plaintiff, both during his employment and upon termination of that employment.

As Defendant argues, and Plaintiff does not contest, the doctrine of unjust enrichment does not apply where there is an express contract governing the relationship between the parties. *See Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir. 1992) (plaintiff not allowed to bring unjust enrichment action for unpaid commissions, where right to commissions was governed by contract); *see also United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999) (normally, unjust enrichment may not be maintained where there is an express contract on the subject); *Brooks v. Valley Nat'l Bank*, 548 P.2d 1166, 1171 (Ariz. 1976) (where there is a specific contract governing the relationship between the parties, doctrine of unjust enrichment has no application). Since there is a contract in this case governing payment of commissions upon termination of Plaintiff's employment, the claim for unjust enrichment must be dismissed.

**Breach of Contract:** As noted above, this issue is addressed as a request to amend the complaint to add a claim, because the claim was not contained in the original complaint. Plaintiff contends, in his affidavit, that even applying the SOM provision discussed above, he is entitled to receive a greater amount in commission payments than he was paid. He maintains that his date of termination was not March 13, 2001, the date used by Defendant to calculate the commissions owed Plaintiff. Instead, he claims the relevant date should be in April, 2001, when his severance check was issued by Defendant. Furthermore, he contends he is entitled to commissions coming due through

[2]The Incentive Plan specifically references the SOM and Plaintiff was required to acknowledge that he had discussed the SOM with his manager. (Exh. 3, MSJ)

the end of April, because the SOM provision mandates payment of commissions through the end of the month in which the employee was discharged. The Court disagrees with Plaintiff's positions.

According to the SOM, a Sales Professional such as Plaintiff "is not entitled to commissions from ongoing revenue billed after his/her termination date or for LEC Agency payments not yet received by Norstan." In addition, "if the down payment was not collected before departure, the employee will not receive any Bookings/Revenue related commissions/bonuses after his/her termination date." Finally, the Sales Professional "will receive on the normal payment timetable, all commissions and bonuses payable up to the date of separation." The date of termination or separation, therefore, cuts off an employee's right to commissions that might still be in the pipeline, as Plaintiff acknowledged in his deposition.[3]

When Plaintiff was laid off, he was given a memorandum stating that his last day of employment would be March 13, 2001. The memorandum also stated he would receive two weeks of severance pay. Also, in Plaintiff's complaint, he alleged that he was discharged on March 13, 2001. Despite this evidence and his earlier allegation, Plaintiff attempts to raise a question of fact by

[3]Plaintiff argues that even if this SOM provision could be considered a contract, the contract is ambiguous and evidence must be taken as to the parties' intent. Plaintiff does not explain how the contract is ambiguous, or provide any authority for his argument. This is another example of Plaintiff raising a new issue in the case without following the proper procedures or properly developing the argument. Nonetheless, the Court will address the contention. Under New Mexico law a contract is "ambiguous" only when its language can be fairly and reasonably construed in different ways. *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1 (N.M. 1998). That does not appear to be the case with regard to the commission provision of the SOM. However, to the extent the provision might be considered ambiguous, Plaintiff did provide evidence regarding his understanding of the provision--he understood that any sales rep who had worked on an account, but was terminated before dollars came in to Norstan, would not get commissions. (Orgill dep. p. 85, Exh. 1, MSJ) This understanding comports with the language of the SOM provision, which indicates that some form of payment must be received by Norstan, prior to the date of termination, in order for the employee to be entitled to a commission. The Court therefore finds that, even considering the extrinsic evidence submitted by Plaintiff, the agreement between the parties cuts off Plaintiff's right to commissions as of the date of termination.

pointing to the last check he received from Defendant, which was dated April 6, 2001, for the period ending April 7, 2001. (Exh. 2 to Pltf. Affidavit) This check does not raise an issue because the earnings statement accompanying the check explicitly denominates the check as severance pay, rather than regular pay. Thus, there is no dispute that Plaintiff's last day of employment was March 13, and the check dated April 6 is merely the severance check that was promised in the memorandum notifying Plaintiff of his layoff.

Plaintiff has cited no authority or evidence for the proposition that the date a severance check is cut might be considered the date an employee is terminated or separated from employment. The plain meaning of the phrases "date of separation" or "date of termination" or "date of departure" is the date the employee's job ends, which is the employee's last day of work. In the absence of any evidence indicating that was not the parties' intent in this case, the Court will apply this plain meaning and find that Plaintiff's date of termination, separation, or departure was March 13, 2001.

The Court also disagrees with Plaintiff's contention that he should have received commissions through the end of the month in which he was discharged, whether that was March or April. Plaintiff relies on a sentence in the SOM provision which states as follows: "AEs, EAMs and Partnered Account Managers receive commission/bonuses based on revenue recognized the last full month of employment." First, this sentence does not apply to Plaintiff, because he was not an "AE" or an "EAM" or a "Partnered Account Manager." (Keller dep., 118-24, Exh. C, Pltf. Resp.) He was a "BSG," which fell under the general category of Sales Professional, a title which included all of the foregoing positions. (*Id.*) Second, if Plaintiff was covered by this sentence, he was entitled to commissions based only on revenue recognized in his last *full* month of employment, which would have been February 2001, since he only worked part of the month of March. The Court therefore

will reject Plaintiff's argument that he was entitled to commissions on payments received by Norstan beyond March 13, 2001.

Plaintiff, in one sentence in a footnote in his response brief, argues that if the SOM is considered a contract, Defendant violated the RIF provision of the manual. That provision states that "[i]n layoff situations, demonstrated ability to perform the remaining work in the department combined with previous performance will determine which employees will be laid off." (Exh. E, Pltf. Resp.) Mr. Keller, who claims to have made the decision to lay off Plaintiff instead of his co-worker, admitted that he did not consider past performance in making that decision. (Keller dep. pp. 147-48, Exh. C, Pltf. Resp.) Without briefing from the parties, the Court is reluctant to consider the question of whether the statement in the SOM concerning previous performance is sufficiently explicit and specific as to be considered a contractual limitation on Defendant's layoff decisions. *Cf. Mealand*, 33 P.3d at 291-92 (provision of handbook stating no employee would be terminated without prior review by Human Resources department was sufficiently explicit to restrict employer's right to terminate at will). Furthermore, this breach-of-contract claim does not appear in Plaintiff's complaint, and in deciding whether to allow Plaintiff to amend the complaint to raise such a claim, the Court must consider any prejudice Defendant might suffer, a question that has not been briefed by any party. Therefore, the Court will not at this time decide whether the claim might be viable. If Plaintiff wishes to pursue such a claim, he should submit a request to amend the complaint, explaining why the issue is viable and why he should be allowed to amend at this late date.[4]

---

[4]This issue is unlike the new claim raised in Plaintiff's affidavit, discussed above. That termination-occurred-in-April argument requires only an examination of the facts and documentary evidence adduced during discovery. This issue, on the other hand, cannot be decided on the record before the Court at this time. For that reason, the Court refrains from a decision on this issue, while addressing the other new claim raised by Plaintiff.

The new claim raised in Plaintiff's affidavit is without merit, as discussed above. The Court will therefore not allow an amendment of the complaint to add the claim. Furthermore, the new claim raised in the footnote in Plaintiff's response brief may not be decided on the current record. That claim, should Plaintiff decide to try to raise it, must be addressed in a separate motion. At this time, therefore, Plaintiff will not be allowed to raise a breach of contract claim.[5]

**Wrongful Discharge in Violation of Public Policy:** Plaintiff maintains he was discharged in order to allow Defendant to avoid paying him the commissions that were in the pipeline. He argues that it is against public policy to fire an employee in order to appropriate the commissions that would otherwise be payable, once the pending contracts were finalized. He further argues that New Mexico recognizes a cause of action for wrongful discharge in violation of public policy. Defendant attacks Plaintiff's claim in two ways. Defendant first argues that the claim fails as a matter of law, and

---

[5]The Court acknowledges the seeming unfairness of a contract which refuses any commission for work performed by an employee that leads to substantial revenues for an employer. Several courts have commented on this unfairness, and one has gone so far as to declare such a provision unconscionable. *See Ellis v. McKinnon Broadcasting Co.*, 23 Cal.Rptr.2d 80 (Ct.App. 1993). Despite the one-sided nature of a provision cutting off an employee's right to a commission, however, the vast majority of cases addressing the issue have enforced such provisions, and *Ellis* has been rejected by another division of the California Court of Appeals. *American Software, Inc. v. Ali*, 54 Cal.Rptr.2d 477 (Ct.App. 1996). Furthermore, it is difficult for the Court to determine the extent of unfairness in this case, for several reasons. First, Plaintiff's base salary of $45,000 per year is not an insignificant amount, and there is no indication he was not paid this salary during the period he was working on the contracts at issue in this case. Second, it is not clear to the Court how many contracts that were in the pipeline were actually finalized, how much additional work had to be performed to finalize those contracts, and how much of Plaintiff's potential commissions was paid to other employees who worked on finalizing the contracts. For example, if Plaintiff had already performed 95% of the work necessary to finalize a contract, and all that was left was to receive funding from the federal government and then sign a contract, the unfairness to Plaintiff is more acute than would be the case if another employee had to step in after funding was approved and spend a substantial amount of time finalizing the deal with the schools. Given the absence of clear evidence on the actual loss to Plaintiff and the actual gain to Defendant resulting from the termination of Plaintiff's employment, the Court is not inclined to declare the SOM provision so unfair as to be unenforceable.

secondly contends there is no factual support for the claim. The Court will address each of these defenses in turn.

**Viability of claim as a matter of law:** Defendant points out that the only type of public-policy wrongful discharge cause of action recognized by New Mexico courts to date is a retaliation claim, where an employee has been fired for engaging in conduct sanctioned by public policy or for refusing to engage in conduct that would violate public policy. The Court recognizes that New Mexico has to date not applied the public policy exception to at-will employment in any context other than retaliatory discharge. *See, e.g., Silva v. American Federation of State, County, and Municipal Employees*, 37 P.3d 81, 83 (N.M. 2001) (the two exceptions to the at-will employment doctrine in New Mexico are breach of implied contract and retaliatory discharge). Plaintiff's claim is clearly not this type of cause of action.[6] After reviewing case law from other jurisdictions, however, the Court is convinced that New Mexico would allow some type of cause of action in the following circumstances, which Plaintiff alleges are present here: (1) the employee has already performed work for which commissions would normally be paid; and (2) the employer discharged the employee in order to avoid paying commissions for the employee's past work.

The vast majority of jurisdictions that have considered this question have recognized a potential cause of action under the circumstances described above. However, they have differed in the analytical approach used to reach that result. A number of courts have applied the implied

---

[6]Plaintiff's response brief does attempt to add a retaliation claim, alleging he was laid off in retaliation for complaints he had made at some earlier time, concerning commissions on a particular sale. The Court does not believe New Mexico courts would expand the public-policy exception to the at-will employment doctrine to encompass situations in which an employee is fired for disputing the amount of compensation he should receive. *See Garrity v. Overland Sheepskin Co. of Taos*, 917 P.2d 1382, 1386-89 (N.M. 1996) (refusing to apply exception where employees were fired for reporting drug use which affected only their personal work situations, rather than a danger to the public).

covenant of good faith and fair dealing, which is present in almost every contract, to the agreement the employer has made to pay commissions or other benefits to the employee. According to these courts, it is a violation of the implied covenant to discharge an employee in order to avoid having to pay commissions or other benefits, already earned but not yet payable, to the employee. *See, e.g., Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1125 (1st Cir. 1995) (under Massachusetts law, implied covenant of good faith and fair dealing prohibits employer from terminating employee in order to deprive employee of a benefit to which he is entitled); *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985) (covenant of good faith is implicit in commission contract; even though employee was employed at will, employer could not discharge employee in order to avoid paying commissions which are otherwise earned); *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1297 (N.D.Ill. 1983) (law seems fairly clear that an employee at will may not be deprived of commissions, in large part "earned" prior to separating from employer, by a discharge intended to deprive the employee of the commissions); *Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615, 626-27 (Wyo. 2000) (long-term employee who is discharged to allow employer to avoid responsibilities to employee, such as benefits or commissions, has action for violation of implied covenant of good faith and fair dealing). In New Mexico, if this type of claim were recognized, it would likely be an action for breach of contract rather than tort. *See Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 875 (N.M. 1994) (in context of employment contract, action for breach of implied covenant of good faith and fair dealing would be action on contract, not tort action).[7] It is however not necessary at

---

[7]In California, on the other hand, a discharge calculated to deprive an employee of earned commissions or benefits violates public policy, and a wrongful-discharge action, sounding in tort, may be premised on such a discharge. *See Gould v. Maryland Sound Indus., Inc.*, 37 Cal.Rptr.2d 718, 723-24 (Ct.App. 1995). The public policy violated by such a discharge, according to California courts, is the policy that an employee is entitled to be paid all compensation due at the time of discharge, as set out in several California statutes. *Id.*

One federal court in California and at least one court in Connecticut have allowed the

this time, especially without any legal briefing on the point, to decide whether New Mexico would treat such a claim as a tortious wrongful discharge action, or would recognize a claim for breach of the implied covenant of good faith and fair dealing. It is enough to hold that Plaintiff's claim does not fail as a matter of law.[8]

**Viability of claim as a matter of fact:** As discussed, Plaintiff claims he was discharged so Defendant could avoid paying him the commissions that were in the pipeline and would be payable in the next few months. Defendant maintains Plaintiff was discharged because his expertise was in e-rate sales, and Defendant was attempting to get out of the e-rate business. In order to survive the summary-judgment motion, Plaintiff must raise a genuine issue of material fact as to Defendant's intent in discharging him. However, he has introduced no direct evidence of Defendant's motives, and instead must rely only on circumstantial evidence. This claim, therefore, is similar to a retaliation claim or a disparate treatment claim, in which the employer's motivation is also the key issue, and in which direct evidence of retaliation or discrimination is rarely present. The Court finds the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified to fit this case, helpful in assessing this issue. *See Reynolds v. School Dist. No. 1*, 69 F.3d 1523,

---

discharged employee to proceed on both the implied-covenant claim and a tortious wrongful-discharge claim. *See McCollum v. XCare.net, Inc.*, 212 F.Supp.2d 1142, 1152-55 (N.D.Cal. 2002) (discussing viability of each claim); *Cook v. Alexander and Alexander of Connecticut, Inc.*, 488 A.2d 1295, 1296-97 (Conn.Super. 1995) (same). Finally, in New Mexico, a federal judge has held that a public-policy wrongful discharge claim could be maintained where the employee was allegedly discharged in order to prevent his retirement benefits from vesting. *Salazar v. Furr's, Inc.*, 629 F.Supp. 1403, 1409 (D.N.M. 1986).

[8]The Court recognizes that Plaintiff framed his cause of action only in terms of the wrongful-discharge-in-violation-of-public-policy type of claim. However, the Court sees no unfairness to Defendant if the Court were to allow Plaintiff to proceed on the breach-of-implied-covenant theory instead. The essential point of each claim is the same--that Defendant allegedly discharged Plaintiff, rather than another employee, because Plaintiff had a large amount of commissions outstanding and Defendant was attempting to save money.

1533-34 (10th Cir. 1995) (applying *McDonnell Douglas* framework to § 1981 claim where no direct evidence of discrimination was presented). Under the burden-shifting framework, the Court first examines Plaintiff's evidence to determine whether Plaintiff has presented a prima facie case. If so, the Court reviews Defendant's explanation for discharging Plaintiff, to determine its validity. If Defendant has offered an explanation that contradicts Plaintiff's claim of being discharged to save Defendant money, the Court will decide whether Plaintiff has raised an issue of fact as to whether Defendant's explanation was the true reason for the discharge. *Cf. id.*

Plaintiff has presented the following evidence in this case: (1) Defendant was in financial difficulty at the time Plaintiff was laid off, having lost approximately $67,000,000 in one fiscal quarter (Pltf. dep. p. 80, Exh. 1, MSJ); (2) Plaintiff was one of Defendant's top sales representatives in the country, having been ranked ninth out of 164 in March 2001 (Exh. 16 to Exh. C, Keller dep., Pltf. Resp.); (3) Keller admitted that he was aware of the sales that were in Plaintiff's pipeline at the time he discharged Plaintiff (Keller dep. p. 169, Exh. C, Pltf. Resp.); (4) the employee retained instead of Plaintiff, Mr. Watlington, was ranked 32d in the country and had substantially lower booking and margin percentages than did Plaintiff (Exh. 16, *id.*); (5) Keller did not consider past performance in deciding whether to lay off Plaintiff or Mr. Watlington, even though the SOM specifically states that past performance will be a consideration in reduction-in-force decisions (Keller dep. p. 147, *id.*); (6) Defendant also laid off the top two salespeople in its Oklahoma market, one of whom was the sixth-ranked salesperson in the country, and the top-ranked salesperson in Arizona, who was ranked second in the country (Exhs. F and G, Pltf. Resp.; Exh. 16 to Exh. C, *supra*); and (7) these individuals had substantial commissions in the pipeline at the time their employment was terminated (*Id.*).[9]

[9]The Court recognizes that Defendant has filed a motion in limine to exclude the testimony of these two individuals. By relying on their affidavits in this opinion, the Court is not impliedly ruling that their testimony will be admitted at trial. At this point, however, the only *facts* (as opposed

The above evidence tends to show that Defendant needed to cut costs and could cut more costs by laying off Plaintiff rather than Watlington. It also tends to show there was no performance-based reason for discharging Plaintiff; in fact, if performance had been considered, Watlington would have been the one discharged. Finally, this practice of laying off the more proficient salesperson, who would presumably be the one kept on if normal business practices were followed, was not limited to New Mexico but occurred in (at least) Oklahoma and Arizona as well. The Court finds Plaintiff has made a prima facie showing that he was chosen for layoff, at least in part, due to Defendant's desire to avoid paying him the commissions that were in the pipeline.

The Court now turns to Defendant's explanation for choosing to discharge Plaintiff rather than Watlington. Defendant maintains that Plaintiff was chosen because he worked almost exclusively on e-rate business, and Defendant intended to leave the e-rate business. (Pltf. dep. p. 41, Exh. 1, MSJ; Keller dep. p. 172, Exh. C, Pltf. Resp.). Watlington, on the other hand, did no work in the e-rate field prior to Plaintiff's discharge. (Pltf. dep. p. 93, Exh. A, MSJ). In addition, Watlington had substantially more seniority with the company. (Keller Affid., Exh. 5, MSJ). Defendant's assertions that it planned to leave the e-rate field are supported by an exchange of e-mails in April 2001, between executives employed by Defendant. One of these e-mails states, "I am sending this E-Mail as confirmation of our decision on the issue of E-Rate focus in the new fiscal year. As we agreed,

---

to argument of counsel) before the Court are that both individuals were discharged close to the time Plaintiff was discharged, and both were discharged instead of other sales employees who did not have substantial commissions in the pipeline. This evidence is relevant to the issue of whether Defendant was targeting for layoff those individuals to whom it expected to owe the largest commissions. *Cf., e.g., Curtis v. Oklahoma City Pub. Schls. Bd. of Educ.*, 147 F.3d 1200, 1217 (10th Cir.1998) (testimony of other employees may be relevant in assessing an employer's retaliatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employer's assertion of legitimate motives). The question of whether its relevance is outweighed by other concerns, such as the necessity of holding mini-trials as suggested by Defendant, remains to be answered.

we will not pursue E-Rate business on a vertical or focused basis. We will evaluate educational opportunities as we would any other sales opportunity and assess the merits of the sale compared to other sales opportunities..." (Grennier e-mail, April 10, 2001, Exh. 4 to Keller dep., Exh. C, Pltf. Resp.).

The explanation proffered by Defendant, for selecting Plaintiff for layoff, provides a non-commission-related reason for the choice. Under the *McDonnell Douglas* framework, the burden then shifts back to Plaintiff to provide evidence that Defendant's explanation is a pretext, and that the desire to avoid paying him the commissions that were in the pipeline was the actual reason for his discharge. The following evidence is relevant to the pretext issue: (1) although Plaintiff was primarily performing e-rate work when he was discharged, he had experience with non-e-rate business as well, as at times only 60% of his time was spent on e-rate business (Pltf. dep. p. 33, Exh. 1, MSJ); (2) Defendant apparently still contemplated a business relationship with some of the schools Plaintiff had worked with on the e-rate business, and would continue to view e-rate funds as an alternative source of funding for contracts (Stanley e-mail, April 10, 2001; Grennier e-mail, same date; Exh. 4 to Keller dep., Exh. C, Pltf. Resp.); (3) seniority with the company was not one of the factors to be considered in making layoff decisions, according to the SOM policy on RIFs (Exh. E, Pltf. Resp.); (4) the issue of commissions was in management's mind with respect to the existing e-rate contracts, as one e-mail from Grennier stated "[w]e have alot (sic) of players in the commission mix and will need to maneuver through that if projects are funded." (Grennier e-mail, April 11, 2001, *id.*); and (5) as noted above, there is a possibility that Defendant engaged in a pattern of laying off salespeople to whom Defendant owed the highest amounts of commissions, including at least one (Gray) who was apparently not involved in e-rate business.

From all of the evidence discussed above, a reasonable fact-finder could draw the conclusion that Plaintiff was a better salesperson than Watlington, and would have been a better salesperson even in non-e-rate transactions, due to his extensive contacts with New Mexico schools and his demonstrated abilities. The fact-finder could also conclude that Defendant did not follow its own policies in determining which sales representative to discharge. Finally, the fact-finder could conclude that Defendant acted in a seemingly short-sighted manner, by laying off many of its best salespeople, and could conclude in addition that one motivation for Defendant to do this would be the immediate cash savings that would result from not having to pay commissions to these individuals. The Court therefore finds that Plaintiff has raised a genuine issue of fact as to whether his discharge was motivated by Defendant's desire to avoid paying him commissions on the contracts that were in the pipeline at the time he was laid off. This claim, whether denominated as a breach-of-contract claim or a wrongful-discharge claim in tort, will not be dismissed.[10]

**Statutory Claim:** Plaintiff maintains that Defendant's failure to pay him the commissions that he claims he is owed violated NMSA § 50-4-4. This statute requires an employer who has discharged an employee to pay the unpaid wages and compensation of the employee within either five days, if the amount is fixed and definite, or within ten days. Defendant argues in its reply brief that the statute

---

[10]The parties may address the issue of how to characterize this claim when they submit their proposed jury instructions. They should consider the following cases in doing so, in addition to the cases cited previously in the body of the opinion: *Garrity, supra*, 917 P.2d at 1386-89 (in public policy retaliatory-discharge case involving whistle-blowing, plaintiff must point to more than just a public policy supporting the claim; benefit to the public as a whole must also be demonstrated); *Kropinak v. ARA Health Servs., Inc.*, 33 P.3d 679, 682-83 (N.M.App. 2001) (emphasizing New Mexico's continued support of the at-will employment doctrine; refusing to apply implied covenant of good faith and fair dealing to at-will provision of an employment contract; noting that, under *Bourgeous, supra*, the implied covenant does apply to an employment contract that is not at will). In the Court's view, as set out above, the commission provisions of the SOM and Incentive Plan constitute an express contract. It therefore appears the implied covenant might apply to that aspect of the employer/employee relationship.

does not apply to Plaintiff, because he was paid in part on a commission basis. This argument has no merit. Section 50-4-4(A) does exempt commissions from its provision that fixed amounts of compensation must be paid within five days; however, Section 50-4-4(B), requiring payment within ten days, includes "all other" cases of discharged employees, which includes those paid on a commission basis. *See Litteral v. Singer Business Machines Co.*, 533 P.2d 754 (N.M. 1975) (applying similar statute to commissions owed to an employee).

Plaintiff's claim still fails, however. As discussed above, under the express terms of the contract between Plaintiff and Defendant regarding payment of his commissions, he was not entitled to payment of any commissions on contracts finalized after the date he was discharged, or contractual payments received after that date. Defendant therefore paid him all of the commissions he was owed, by contract, within the appropriate time period. The fact that Plaintiff may have a different remedy, arising out of his discharge, that might allow him to recover his commissions does not bring Section 50-4-4 back into play. That Section applies only to unpaid wages and compensation owed by the employer under the terms of the employment contract between employer and employee, and does not apply as a substitute for a wrongful-termination or breach-of-contract claim such as those discussed above.

**Conclusion**

Based on the foregoing, the Court will dismiss Plaintiff's unjust enrichment claim and will not allow him to amend the complaint to add a breach-of-contract claim based on the failure to pay commissions on transactions finalized prior to the end of April, 2001. The Court will not dismiss Plaintiff's claim that he was laid off to allow Defendant to avoid paying him the commissions on contracts awaiting funding decisions at the time he was discharged. This claim will proceed to trial

on either a breach-of-implied-covenant basis or as a wrongful-discharge cause of action. Finally, Plaintiff's statutory claim, based on NMSA § 50-4-4, will be dismissed.

**ORDER**

A Memorandum Opinion having been entered this date, it is hereby ORDERED that Defendant's motion for summary judgment (Doc. 39) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 5th day of December, 2002.

BRUCE D. BLACK
United States District Judge

**ATTORNEYS**:
**For Plaintiff**:
Lorna M. Wiggins
Patricia G. Williams

**For Defendant**:
Richard S. Cohen
Troy P. Foster
George McFall